UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| HOMEPOINT FINANCIAL CORPORATION d/b/a HOMEPOINT,<br><br>Plaintiff,<br><br>v.<br><br>AMRES CORPORATION<br><br>Defendant. | Case No. 23-cv-11515<br><br>Honorable Robert J. White |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SANCTIONS**

I. <u>Introduction</u>

Home Point Financial Corporation d/b/a Homepoint (Homepoint) sued AmRes Corporation (AmRes) for breach of a Correspondent Mortgage Loan Purchase Agreement (the "Agreement"), alleging that AmRes failed to repurchase a loan as the Agreement required.

Before the Court are Homepoint's motion for summary judgment, AmRes's motion for sanctions, and the associated responses and replies. (ECF Nos. 40, 41, 43–45). AmRes seeks sanctions based on Homepoint's failure to make required disclosures, namely its failure to identify Alina Wright before submitting her

declaration in support of summary judgment. The Court will decide the motions without a hearing pursuant to E.D. Mich. LR 7.1(f)(2).

For the following reasons, (1) Homepoint's motion for summary judgment is granted as to liability and denied without prejudice as to damages, and (2) AmRes's motion for sanctions is denied.

## II. Background

### A. *Factual history*

Homepoint and AmRes entered into a Correspondent Mortgage Loan Purchase Agreement in April 2018, governing Homepoint's purchase of mortgage loans from AmRes for resale on the secondary market. (ECF No. 40-1, PageID.344-66). Under the Agreement, AmRes represented that the loans it sold to Homepoint would meet applicable investor guidelines and be eligible for purchase by the relevant investor. (*Id*. at PageID.347, 351-52). AmRes also agreed to make "full, truthful and accurate disclosure" of information pertaining to loans submitted to Homepoint, including circumstances that could affect a loan's "salability" or Homepoint's decision to acquire it. (*Id*. at PageID.347). This dispute concerns one of the mortgage loans AmRes sold to Homepoint under that Agreement.[1]

[1] In recounting the facts relevant to liability, the Court considers the parties' Agreement (ECF No. 40-1, PageID.344-66), AmRes's admissions (ECF No. 7), and the contemporaneous correspondence independently of Alina Wright's contested declaration (ECF No. 40-1, PageID.376-84; ECF No. 40-2, PageID.399-404).

In February 2022, AmRes employees discussed a potential eligibility issue involving a loan secured by a condominium in Miami, Florida. (ECF No. 40-2, PageID.399–404). AmRes's Director of Post Closing, Gina Antonello, wrote that the information she had received "looks like this is an issue" and questioned whether an investor would take the loan. (*Id.* at PageID.401). AmRes subsequently sold that loan to Homepoint on March 3, 2022, under the parties' Agreement. (ECF No. 7, PageID.55–56, ¶ 16). The Agreement warranted that the loan was "saleable to Fannie Mae, Freddie Mac and GNMA, as applicable, on a non-recourse basis." (ECF No. 40-1, PageID.352).

Homepoint then sold the loan to Freddie Mac, a secondary market investor. On August 3, 2022, Freddie Mac sent Homepoint a letter demanding that it repurchase the loan by October 2, 2022. (*Id.* at PageID.372–74). Freddie Mac identified two condominium-project eligibility issues. First, it stated that the project

---

AmRes admits to entering into the Agreement and relies on its provisions in opposing summary judgment. (ECF No. 7, PageID.55–56, ¶ 16; ECF No. 41, PageID.410-17). The correspondence's identifying information, contents, and connected exchanges establish its authenticity. *See* Fed. R. Evid. 901(b)(4). Statements by AmRes employees concerning matters within the scope of their employment are admissible against AmRes under Fed. R. Evid. 801(d)(2)(D). Homepoint's communications are considered to establish the notices, deadlines, and demands it communicated to AmRes rather than the truth of the defects asserted. Similarly, Freddie Mac's repurchase demand is considered to establish the demand and its stated reasons, rather than the truth of the alleged condominium defects. These uses do not implicate the prohibition against hearsay. *See* Fed. R. Evid. 801(c).

was licensed as a reservation program, a form of transient housing that made it ineligible under Freddie Mac's guidelines. Second, it stated that the homeowners' association was involved in litigation concerning the project's safety, structural soundness, and habitability. (*Id.* at PageID.374).

The Agreement addressed such repurchase demands by secondary investors. Section 10(A)(iv) provided that, when Homepoint "must repurchase a loan from any secondary market investor regardless of the reason(s) and/or the merit(s) of any reason," AmRes "must repurchase from [Homepoint] on demand." (*Id.* at PageID.355). Additionally, Section 10(B) required AmRes, upon notification from Homepoint, to correct or cure an identified defect "within the time prescribed by" Homepoint, "to the full and complete satisfaction of" Homepoint. If AmRes could not cure within that time, Homepoint could require repurchase or another specified remedy. (*Id.* at PageID.356).

On August 29, 2022, Homepoint's Director of Repurchase, John Olsen, forwarded Freddie Mac's repurchase request to AmRes. Olsen identified both eligibility issues, requested information and supporting documents to cure them, and asked AmRes to respond by October 2. (*Id.* at PageID.382–83). The next day, AmRes's Director of Credit Risk, Brenda Barlow, responded that she was working on the matter. (*Id.* at PageID.382).

Olsen followed up on September 22, asking whether AmRes could respond by September 30 because October 2 fell on a Sunday. (*Id.* at PageID.381). On September 25, he sent Homepoint's formal five-day opportunity-to-cure notice and instructed AmRes to "[p]lease provide a response or concur to repurchase by Friday 9/30/22." (*Id.* at PageID.380). The attached notice repeated Freddie Mac's concerns and advised that Homepoint could require AmRes to repurchase the loan if it could not cure the identified defects within five days. (*Id.* at PageID.386).

Barlow requested an extension from Homepoint on September 26, explaining that AmRes had "a lot of due diligence to complete" and had not finished. (*Id.* at PageID.380). Olsen declined, stating that Freddie Mac was not granting extensions and that he needed AmRes's response by September 30. (*Id.* at PageID.379). On September 27, Barlow requested the loan's payment history, which Olsen provided that day. (*Id.* at PageID.378–79). Two days later, Olsen followed up again and asked whether AmRes would "submit an appeal tomorrow or concur to repurchase." (*Id.* at PageID.377).

On October 3, Olsen informed Barlow that because a response had not been submitted within the permitted time, he would begin the repurchase process and that someone from Homepoint's recovery department would contact AmRes "to arrange the repurchase from Homepoint." (*Id.*). Barlow responded the next morning, "Understood," and requested the information Homepoint had concerning the

homeowners' association litigation. She explained that the association had been unresponsive despite AmRes's repeated attempts to contact it. (*Id.* at PageID.376). Olsen replied that Freddie Mac had not provided litigation materials with its repurchase request. (*Id.*).

AmRes maintains that the formal five-day notice afforded insufficient time to investigate and cure the condominium-project issues and violated the implied covenant of good faith and fair dealing. (ECF No. 41, PageID.413–16). Homepoint seeks damages arising from AmRes's alleged failure to repurchase the loan. (ECF No. 40, PageID.333-34).

The Agreement defines the "Repurchase Price" to include the unpaid principal balance, accrued unpaid interest, enforcement and servicing expenses, and any premium paid to AmRes. (ECF No. 40-1, PageID.356). In its interrogatory responses, Homepoint stated that it later sold the loan in June 2023 and claimed a resulting shortfall of $91,508.49 and an unreimbursed premium of $21,918.60, excluding interest, attorney's fees, and costs. (ECF No. 45-1, PageID.462–63). The amount of recoverable damages remains to be determined.

B. *Procedural history*

Homepoint commenced this action in June 2023, alleging that AmRes breached the parties' Agreement by failing to repurchase the loan. (ECF No. 1). Homepoint now moves for summary judgment on its breach-of-contract claim. (ECF

No. 40). AmRes opposes that motion and separately moves for sanctions based on Homepoint's failure to identify Alina Wright before submitting her declaration in support of summary judgment. (ECF Nos. 41, 44). Homepoint opposes the sanctions motion. (ECF No. 45).

III. Legal Standard

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party opposing a properly supported motion cannot rely on allegations or denials alone but must present specific facts showing a genuine dispute for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

IV. Analysis

The Court first considers whether Homepoint is entitled to summary judgment as to liability on its breach of contract claim.

A. *Liability for Breach of Contract*

Under Michigan law, a breach-of-contract claim requires (1) proof of a contract, (2) a breach, and (3) resulting damages. *Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74, 100 (2016). The Court determines the parties' intent from the plain and ordinary meaning of the contractual language. *Id.* at 85–86.

Unambiguous provisions must be enforced as written, without imposing requirements absent from the agreement. *Id.* at 86, 107. A court may not rewrite those provisions based on its own assessment of the bargain's reasonableness. *Rory v. Continental Ins. Co.*, 473 Mich. 457, 468–70 (2005).

1. Existence of the Contract and Repurchase Obligation

There is no genuine dispute concerning the existence of the parties' Agreement or its application to the loan at issue. AmRes admits that it entered into the Correspondent Mortgage Loan Purchase Agreement with Homepoint in April 2018 and that Homepoint purchased the loan from AmRes under that Agreement on March 3, 2022. (ECF No. 7, PageID.46, 55–56, ¶¶ 5, 16).

Homepoint contends that Freddie Mac's repurchase demand triggered AmRes's obligation to repurchase the loan. (ECF No. 40, PageID.329-33). Section 10(A)(iv) of the Agreement governs that obligation. It provides that, when Homepoint "must repurchase a loan from any secondary market investor regardless of the reason(s) and/or the merit(s) of any reason," AmRes "must repurchase from [Homepoint] on demand." (ECF No. 40-1, PageID.355).

Here, Freddie Mac required Homepoint to repurchase the loan by October 2, 2022, based on two identified condominium-project eligibility issues. (*Id.* at PageID.372–74). That demand triggered Homepoint's right under Section 10(A)(iv)

to require AmRes to repurchase the loan, subject to the opportunity to cure provided by Section 10(B) discussed below.

2. Breach of the Repurchase Obligation

Homepoint contends that AmRes breached the Agreement by failing to repurchase the loan after the prescribed cure period expired without a cure. (ECF No. 40, PageID.332). AmRes does not dispute that it failed to repurchase the loan. It argues, however, that Homepoint demanded repurchase without providing a meaningful opportunity to cure pursuant to Section 10(B) of the Agreement.[2] (ECF No. 41, PageID.410–17). Whether AmRes breached the Agreement therefore turns on whether Homepoint provided the opportunity to cure required by Section 10(B).

Section 10(B) required AmRes, upon notification from Homepoint, to correct or cure an identified defect "within the time prescribed by" Homepoint, "to the full and complete satisfaction of" Homepoint. If AmRes could not cure within that period, Homepoint could require repurchase or another specified remedy. (ECF No. 40-1, PageID.356). AmRes argues that (1) the five-day period specified in Homepoint's formal notice was inadequate, and (2) imposing the September 30

[2] In its response to Homepoint's motion for summary judgment, AmRes refers to the opportunity-to-cure provision as Section 8(B) of the Agreement. Section 8(B), however, addresses rescission; the opportunity-to-cure provision appears in Section 10(B). (ECF No. 40-1, PageID.354, 356–57).

deadline violated the implied covenant of good faith and fair dealing. (ECF No. 41, PageID.410–17).

A. *Opportunity to Cure*

AmRes contends that Homepoint failed to provide a reasonable opportunity to cure because its September 25 formal notice allowed it only five days to investigate and cure the identified issues. (ECF No. 41, PageID.413–16). Whether that argument creates a genuine dispute turns first on what constitutes a "notification" to cure under Section 10(B) of the Agreement.

Section 10(B) requires AmRes, upon "notification" from Homepoint, to cure "the defect identified by" Homepoint "within the time prescribed by" Homepoint. (ECF No. 40-1, PageID.356). It does not prescribe a particular form of notification or require a document titled "Opportunity to Cure Notice." Accordingly, the Court must apply those terms without adding a formal-notice requirement the parties did not include. *See Bank of Am., NA,* 499 Mich. at 107. *See also Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1095–96 (6th Cir. 2001) (explaining that courts may not make a different contract for the parties when the contractual language is clear and unambiguous).

The Court finds that Homepoint's August 29 email provided the notification contemplated by Section 10(B). (ECF N0. 40-1, PageID.382-83). That email (1) identified both eligibility issues raised by Freddie Mac, (2) requested supporting

documents to cure them, and (3) specified an October 2 response deadline. Barlow acknowledged the request the following morning and stated that she was working on the matter. (ECF No. 40-1, PageID.382). The September 25 formal notice therefore reiterated an existing request to cure rather than initiating the cure period. By the September 30 response deadline, AmRes had approximately one month to investigate and provide corrective information. (*Id.* at PageID.377–83).

AmRes identifies no evidence that it cured the issues within that period. Barlow requested an extension on September 26 because AmRes had not completed its due diligence, and she continued seeking litigation materials on October 4. (*Id.* at PageID.380). Those communications reflect ongoing investigative efforts, but they do not establish a timely cure. Nor does the agreement require an affirmative refusal to cure before Homepoint may demand repurchase. Section 10(B) explicitly permits that remedy when AmRes cannot cure within the prescribed time. (*Id.* at PageID.356).

The record thus establishes that Homepoint notified AmRes of the identified issues and afforded approximately one month to cure them before proceeding with repurchase. AmRes's focus on the later five-day notice does not create a genuine dispute as to compliance with Section 10(B). Its remaining argument concerns whether Homepoint acted in good faith in setting and enforcing the cure deadline.

### B. *Implied Covenant of Good Faith and Fair Dealing*

AmRes argues that Homepoint's sole discretion to prescribe the cure period carried an implied duty of good faith and fair dealing, which it violated in enforcing the September 30 deadline. (ECF No. 41, PageID.411–16). Under Michigan law, the covenant may arise when the parties leave a matter of contractual performance to one party's discretion. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003). Its purpose is to protect the contracting parties' reasonable expectations. *Id.* The covenant cannot, however, override express contractual terms. *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 657–58 (6th Cir. 2000).

Section 10(B) expressly leaves the cure period to Homepoint, so the implied covenant cannot deprive Homepoint of its contractual authority to set a deadline. (ECF No. 40-1, PageID.356); *see Cook*, 210 F.3d at 657–58. That authority does not itself resolve AmRes's argument that Homepoint selected an unreasonably short period in bad faith. Even assuming the covenant applies and required Homepoint to exercise its discretion in good faith, however, the record does not support a reasonable inference that it failed to do so.

AmRes principally challenges the adequacy of the five-day period specified in the September 25 formal notice. As explained above, however, AmRes had received notice of the issues and the deadline to respond on August 29 and acknowledged that notice the following day. (ECF No.40-1, PageID.382-83). Its

argument therefore does not account for the approximately one month available to investigate and provide corrective information. (*Id.* at PageID.380–83).

Beyond the time afforded to AmRes, the correspondence explains why Homepoint selected and enforced the deadline. Freddie Mac required Homepoint to repurchase the loan by October 2. (*Id.* at PageID.372). Homepoint requested a response from AmRes by September 30 because October 2 fell on a Sunday. (*Id.* at PageID.381). When Barlow sought an extension, Olsen explained that Freddie Mac was not granting extensions and reiterated the Friday deadline. (*Id.* at PageID.379–80). Homepoint also quickly supplied the payment history Barlow requested and again followed up before the deadline to ask whether AmRes would submit an appeal or concur in repurchase. (*Id.* at PageID.377–79). These communications show that the deadline was tied to the Freddie Mac's repurchase requirement and did not arise out of bad faith from Homepoint, and that Homepoint continued engaging with AmRes during the cure period.

AmRes emphasizes that its investigation remained incomplete and that the homeowners' association had not responded to its requests for information. (*Id.* at PageID.376). Those circumstances explain why AmRes sought additional time, but they do not establish that Homepoint acted in bad faith by declining an extension. Section 10(B) expressly requires cure within the prescribed period; it does not

require Homepoint to extend that period until AmRes completes its investigation. (*Id.* at PageID.356).

AmRes also points to internal litigation that it says complicated its investigation and allocation of responsibility for the loan. (ECF No. 41, PageID.415–16). But it identifies no evidence connecting those circumstances to an improper exercise of Homepoint's discretion. Its asserted need for additional time, without evidence of bad faith by Homepoint, does not create a genuine issue for trial. *See Anderson*, 477 U.S. at 252.

Thus, neither AmRes's challenge to the notice nor its good-faith argument creates a genuine dispute concerning Homepoint's compliance with the Agreement's opportunity-to-cure provision. After the cure period expired, Homepoint demanded repurchase, and AmRes does not dispute that it failed to repurchase the loan. (ECF No. 40-1, PageID.377; ECF No. 41, PageID.410–17). The undisputed record therefore establishes that AmRes breached its repurchase obligation.

3. Resulting Loss

The Court may consider interrogatory answers in resolving summary judgment. Fed. R. Civ. P. 56(c)(1)(A). Homepoint's interrogatory response identifies a financial loss resulting from AmRes's failure to repurchase the loan. Homepoint stated that its subsequent sale of the loan produced a shortfall and that the premium it paid AmRes remained unreimbursed. (ECF No. 45-1, PageID.462–

63). That response supports the *existence* of a resulting loss, although it does not sufficiently explain the calculation to establish the precise amount recoverable.

Accordingly, Homepoint's motion for summary judgment is granted as to liability for breach of contract and denied without prejudice as to damages. The Court next addresses AmRes's motion for sanctions and the related discovery necessary to resolve the amount of recoverable damages.

B. *Motion for Sanctions and Further Discovery on Damages*

AmRes seeks sanctions based on Homepoint's failure to make initial disclosures and identify Alina Wright before submitting her declaration in support of summary judgment. (ECF No. 44, PageID.436–39). AmRes contends that the omission prevented it from deposing Wright during discovery and that Homepoint refused its subsequent deposition request because discovery had closed. (*Id*. at PageID.439). It asks the Court to strike Homepoint's pleadings, enter judgment against Homepoint, and award attorney's fees incurred in responding to summary judgment and pursuing sanctions. (*Id*. at PageID.443–44).

1. <u>Consideration of Wright's Declaration</u>

Federal Rule of Civil Procedure 37(c)(1) generally prohibits a party from using a witness or information that it failed to disclose as required by Rule 26(a) or (e), unless the failure was substantially justified or harmless. In assessing those exceptions, courts consider the surprise to the opposing party, its ability to cure the

surprise, the potential disruption of trial, the importance of the evidence, and the nondisclosing party's explanation. *Howe v. City of Akron*, 801 F.3d 718, 747–48 (6th Cir. 2015). The rule also permits other appropriate sanctions instead of, or in addition to, exclusion. *Id.* at 747.

Homepoint does not identify any timely disclosure naming Wright. Its May 2024 interrogatory response stated that it had not yet identified a trial witness and would supplement its answer consistent with the applicable rules and scheduling order. (ECF No. 45-1, PageID.460). Homepoint nevertheless submitted Wright's declaration with its November 2025 summary-judgment motion, after discovery had closed. (ECF No. 40-1, PageID.338-42).

Homepoint responds that it previously produced the supporting documents and disclosed its claimed damages in written discovery. It also argues that AmRes could have requested a Rule 30(b)(6) deposition, for which Homepoint would have designated Wright. (ECF No. 45, PageID.456–57). Those circumstances reduced the surprise concerning the nature of Homepoint's claim, but they did not identify Wright or afford AmRes an opportunity to cure the surprise by examining Wright's knowledge of the records and calculations. *See Howe*, 801 F.3d at 748. Nor did AmRes's failure to request a corporate deposition relieve Homepoint of its disclosure obligations. *See* Fed. R. Civ. P. 26(a)(1)(A)(i) (requiring identification of

individuals likely to have discoverable information that the party may use to support its claims or defenses "without awaiting a discovery request").

The importance of Wright's testimony to the damages calculation makes the opportunity to examine her particularly significant. *See Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 220 (6th Cir. 2019). AmRes requested that opportunity after receiving the declaration, but Homepoint declined because discovery had closed. (ECF No. 44, PageID.439; ECF No. 44-2, PageID.452).

Consequently, Homepoint has not provided a substantial justification for the omission or established that consideration of the declaration without further discovery would be harmless. The Court therefore does not consider Wright's declaration in deciding the pending summary-judgment motion.

2. The Requested Sanctions

Excluding Wright's declaration from consideration on the present motion does not require the Court to terminate Homepoint's claim. In evaluating dismissal as a discovery sanction, the Sixth Circuit considers, "(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered." *Universal Health Grp. v. Allstate Ins. Co.*, 703 F.3d 953, 956 (6th Cir. 2013). Dismissal remains a sanction

of last resort, and courts must consider whether a less drastic response can adequately address the prejudice. *Freeland v. Amigo*, 103 F.3d 1271, 1279–80 (6th Cir. 1997).

The first two factors do not support terminating Homepoint's claim here. Homepoint bears responsibility for failing to disclose Wright and refusing AmRes's subsequent request to depose her. (ECF No. 44, PageID.439; ECF No. 44-2, PageID.452). But it answered written discovery, produced supporting documents, and identified its claimed shortfall and unreimbursed premium. (ECF No. 45-1, PageID.462, 465). The resulting prejudice then concerns AmRes's inability to examine Wright about the records and calculations supporting those amounts—an opportunity the Court can still provide.

The remaining factors likewise weigh against dismissal. AmRes identifies no prior warning that Homepoint's disclosure failures could lead to dismissal, and the record does not show that lesser corrective measures have proved ineffective. In *Universal Health*, by contrast, dismissal followed continued noncompliance after the court imposed an intermediate sanction and extended discovery to permit depositions. 703 F.3d at 955–56.

Here, a limited deposition of Wright can address the identified prejudice without terminating Homepoint's claim. The factors considered together do not

warrant striking Homepoint's pleadings or entering judgment against it. *See Universal Health*, 703 F.3d at 956 (acknowledging that no one factor is dispositive).

AmRes's concern that reopening discovery would prolong the litigation does not alter that conclusion. (ECF No. 44, PageID.443–44). The necessary discovery concerns damages alone and does not require revisiting liability or restarting discovery generally. AmRes has not shown that this limited opportunity would be inadequate to cure the identified prejudice. *See Freeland*, 103 F.3d at 1280 (reversing a sanction that effectively dismissed the action where there was no indication that a less drastic sanction would have failed).

The Court also declines to award the attorney's fees AmRes requests. AmRes seeks fees incurred in opposing summary judgment and pursuing sanctions. (ECF No. 44, PageID.444). Its opposition, however, addressed independently supported liability issues that required resolution regardless of Wright's declaration. (ECF No. 41, PageID.410-17). Moreover, Homepoint produced supporting documents and identified its claimed damages in written discovery. (ECF No. 45-1, PageID.462, 465). Although these circumstances do not excuse Homepoint's failure to disclose Wright, the Court concludes that they make the requested expense award unjust. *See* Fed. R. Civ. P. 37(b)(2)(C). The Court likewise declines a discretionary award under Rule 37(c)(1)(A). AmRes's motion for sanctions is therefore denied.

3. Limited Discovery Concerning Damages

Although the Court can resolve liability independently of Wright's declaration, it cannot determine the amount of damages on the same basis. Homepoint relies on Wright to authenticate the financial records and explain the calculations supporting its claimed loss. (ECF No. 40-1, PageID.340-41). Without her declaration, those records lack an adequate foundation on the present record to establish the amount recoverable. *See* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 901(a), 803(6). Homepoint's interrogatory response identifies its claimed shortfall and unreimbursed premium but does not sufficiently explain how those amounts were calculated. (ECF No. 45-1, PageID.462–63). As discussed above, the Court therefore denies summary judgment as to damages without prejudice.

Limited discovery will allow AmRes to examine Wright, as it previously requested. *Howe* directs courts to consider the opposing party's ability to cure the surprise caused by an untimely disclosure. 801 F.3d at 748. Permitting AmRes to depose Wright before Homepoint renews its damages motion cures the surprise by allowing AmRes to examine her knowledge of the financial records, the foundation for their admission, and the accuracy of the calculations. The Court can then consider a renewed motion on the resulting record.

Therefore, discovery will reopen solely to permit AmRes to depose Wright concerning Homepoint's damages records and calculations. Homepoint must identify and provide the supporting records and calculations at least fourteen (14)

days before the deposition. The deposition must be completed within thirty (30) days of this Order. Homepoint may renew its motion for summary judgment as to damages within thirty (30) days after the deposition. Accordingly,

IT IS ORDERED that Homepoint's motion for summary judgment (ECF No. 40) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Homepoint's motion for summary judgment is GRANTED as to liability for breach of contract.

IT IS FURTHER ORDERED that Homepoint's motion for summary judgment is DENIED without prejudice as to damages.

IT IS FURTHER ORDERED that AmRes's motion for sanctions (ECF No. 44) is denied.

IT IS FURTHER ORDERED that discovery is reopened solely to permit AmRes to depose Alina Wright concerning Homepoint's damages records and calculations. The deposition must be completed within thirty (30) days of this Order.

IT IS FURTHER ORDERED that Homepoint must identify and provide the records and calculations supporting its claimed damages at least fourteen (14) days before the deposition.

IT IS FURTHER ORDERED that Homepoint may renew its motion for summary judgment as to damages within thirty (30) days after the deposition.

Dated: October 9, 2026

s/Robert J. White
Robert J. White
United States District Judge